Filed 11/8/23  In re J.K. CA2/2

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.K. et al., Persons Coming Under the Juvenile Court Law. | B324983 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN K.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 22CCJP01089A, B) |

APPEAL from orders of the Superior Court of Los Angeles County, Tamara E. Hall, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kelly G. Emling, Deputy County Counsel, for Plaintiff and Respondent.

Jonathan K. (father) appeals from a juvenile court order sustaining a petition filed pursuant to Welfare and Institutions Code section 342[1] concerning his son J.K. (born September 2009) and daughter C.K. (born April 2014), and denying his request for custody of the children.  Father argues the section 342 petition should have been dismissed and the matter should be remanded to ensure compliance with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California statutes. We find no reversible error and affirm the orders.

### FACTUAL AND PROCEDURAL BACKGROUND

**The family**

When the proceedings were initiated, J.K. and C.K. were living in California with Ch.K. (mother).[2]  Father was living in Michigan with his girlfriend and her four children.

**Referral and investigation**

On February 28, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging mother drank alcohol daily, smoked marijuana in front of C.K., did not feed C.K. and left the child alone or with homeless people.  The caller further alleged mother drinks and drives and does not provide for C.K.'s basic needs.  The caller was concerned for C.K.'s safety.

A social worker interviewed C.K. at school on March 1, 2022.  C.K. informed the social worker that she lived with her mother and brother and that mother's boyfriend "Uber"

---

[1]     All further unattributed statutory references are to the Welfare and Institutions Code.

[2]     Mother is not a party to this appeal.

sometimes slept there. Though mother and Uber fight, C.K. denied seeing any physical fighting in the home. C.K. reported mother drinks beer and sometimes gets drunk, getting "a little crazy" she would sometimes fall on the ground. (Boldface omitted.) When mother would fall, C.K. would try to help her. Mother also smoked inside the home. C.K. reported mother sometimes gave her a "whooping" and hit her on the legs with a belt.

J.K. was interviewed at his middle school. He confirmed that he resided with his mother and sister. J.K. had no concerns about mother's boyfriend and indicated he did not pay much attention to mother's life. He was unaware that mother drank.

During mother's interview at the family home, she reported that maternal grandmother (MGM), although now clean, used to be a "crack head" and that MGM's boyfriends raped mother when mother was young. Mother admitted she had a drinking problem, stating that she would test positive for alcohol and marijuana, which she did on March 1, 2022. Mother disclosed a 2021 conviction for driving under the influence, for which she was attending classes. Mother said she moved to California from Michigan due to violence to her inflicted by father.

MGM told the social worker that mother was an alcoholic, and mother's boyfriend physically assaulted J.K. MGM explained that J.K. would not report the events in the home to police or social workers because mother threatened to have him sent to juvenile hall. MGM tried to keep C.K. away from mother's home as much as possible because mother and her boyfriend were always fighting. MGM believed mother's boyfriend was a drug dealer, had a gun, and had recently served a five-year prison sentence. Maternal aunt (MA) said she had

3

concerns for years about mother's drinking. There had been times when there was no food at home and the children came to her to eat. MA further shared there had been times when mother's boyfriend and J.K. fought, and the police had been called. MA reported mother was frequently in physical altercations with her boyfriend.

Mother's boyfriend was unwilling to drug test and stated the matter had nothing to do with him. Two neighbors reported hearing loud bangs and fighting between mother and her boyfriend. DCFS became aware that boyfriend had a case with DCFS concerning his seven-year-old son, based on the boyfriend's domestic violence and substance abuse. The boyfriend failed to reunify with his son.

A school social worker reported J.K. had serious attendance and behavior problems at school. The counselor would often see J.K. in the lunchroom being inappropriately physical with other students. School staff would correct the behavior only to have it repeated. J.K. was having trouble following rules and procedures at school.

DCFS spoke with father in Michigan by phone. Father said he spoke to the children by phone daily, but it had been a long time since he had seen them. Father had no concerns regarding mother's alcohol use and said if there was an issue, he would fly to California to get his kids. Father had no issues with mother except she left Michigan with the children without his consent while he was incarcerated. Father said he helps support the children financially. Though not working, father said he was looking for work. Father admitted to a long history with law enforcement but was looking to change. Father's girlfriend, A.S., told DCFS father lived with her and her four children. Paternal

4

grandmother indicated that mother exhibited a drinking problem while living in Michigan.

Michigan child welfare reported an incident in 2017 when C.K. was found unsupervised in a hallway by a neighbor.

Police records logged 10 telephone calls to the police regarding mother's home between 2019 and 2021, for complaints including felony spousal abuse, child welfare check, battery, family disturbance, restraining order violation, attempted suicide, and arguments.

**Removal and section 300 petition**

On March 17, 2022, the juvenile court authorized removal of the children from mother pursuant to a protective custody warrant. The children were detained with MGM.

On March 23, 2022, DCFS filed a section 300 petition alleging that mother physically abused C.K. and abused alcohol and marijuana, which subjected the children to risk of harm.

On March 29, 2022, DCFS provided a last minute information for the court indicating that J.K. did not want to move to Michigan to be with his father and wanted to stay in California.

On March 29, 2022, the juvenile court detained the children from both parents. The court explained that even though father was nonoffending and noncustodial, by requesting custody DCFS had met its burden of showing release to father's custody would be detrimental to the children. The court described the evidence of detriment as a "totality of the factors," including uprooting the children, then seven and 12 years old, from the only life they have known, to place them with their father, who they did not know and had not seen in over four years. Further, the court noted the children had a bond with MGM and father's criminal

history included possession of firearms and a potential history of domestic violence with mother. The court also noted father's girlfriend had a history with child protective services in Michigan. Based on that the court found it would be detrimental to the children to uproot them and have them live with father in Michigan.

**Subsequent reports**

J.K. reported to DCFS that his biggest concern was mother's drinking. He added mother had told him her boyfriend hit her, and the boyfriend once chased J.K. through the apartment and hit him. J.K. said father called frequently after he was released from prison, but J.K. was "not close" to father.

C.K. reported mother had fallen at a store due to her drinking, and mother and her boyfriend smoked weed in C.K.'s presence. C.K. said father used to call every day until they moved in with MGM. C.K. did not want to live with father. She felt safe with MGM or mother, provided mother's boyfriend was not there.

Father told the social worker he was serving a four-year sentence in Ohio when mother moved the children to California. He had been convicted of unlawful possession of a vehicle, possession of a controlled substance, and possession of a firearm. Father said he sent J.K. a cash card when J.K. had no food. Father was in arrears on child support.

**Amended section 300 petition and adjudication**

On April 13, 2022, DCFS filed a first amended section 300 petition. The amendments added allegations that father knew or should have known of mother's substance abuse and failed to protect the children, and father was unable to provide appropriate parental care and supervision. The amendments

6

also added allegations regarding mother and mother's male companion.

The adjudication hearing on the amended petition took place on April 25, 2022. Father testified that he called the children every day or every other day and sent them money. Father had not seen the children in person since they left Michigan as he was not allowed to leave the state, and neither mother nor MGM were amendable to having the children visit him. Father was in compliance with his probation but had warrants for child support. He was convicted of domestic violence against mother years ago but had participated in anger management, cognitive thinking and substance abuse classes while incarcerated. Father served four years in custody for assault (2015 to 2019) and one year in custody for possession of a firearm (2020 to 2021).

After hearing argument the juvenile court sustained allegations concerning mother's substance abuse, physical abuse of C.K., sibling abuse as to J.K., and mother's failure to protect the children from mother's companion's violence. All allegations pertaining to father were stricken and dismissed.

The juvenile court proceeded directly to disposition, hearing testimony from father and father's girlfriend regarding the children potentially moving to Michigan to live with them. The matter was continued to April 27, 2022.

On April 27, 2022, DCFS provided last minute information for the court detailing father's physical abuse of mother as follows: Father had just been released from a reentry program, and he and mother were no longer in a relationship. Father came to mother's home and threw her cell phone after seeing messages on it. Mother yelled at him to leave, and father put her in a

7

choke hold to keep her from screaming. Father was picked up by the police, and a stay away order issued. A couple of days later he was released from jail and returned to mother's home late at night. Neighbors called the police, and father was arrested for violating the stay away order. At trial father was convicted. Mother reported other incidents of domestic violence that had not been reported to the police. In one incident, when mother was seven months pregnant with C.K., father pushed her and she landed on her stomach. Father ripped a screen off the wall that landed on mother while she was lying there. When father finished beating her, he urinated on her in front of J.K., saying, "look at your mom, she is so pathetic."

The disposition hearing was continued to June 1, 2022.

**Section 342 petition**

On May 31, 2022, DCFS filed a section 342 petition on behalf of the children.[3] The section 342 petition contained the following allegation as to father:

"The children['s] . . . father . . . has a long history of violent criminal convictions dating from 2008-2020 including felony convictions for assault, and domestic violence related convictions. The father is currently on federal probation as of January 2022 due to his criminal history. Said conduct, criminal history and acts by the father impairs [*sic*] his ability to adequately parent and protect the children, maintain a suitable, safe and stable home, and places the children at substantial risk of harm."

---

[3] Section 342 permits DCFS to file a subsequent petition after a minor has been found to be a person described by section 300, alleging new facts or circumstances other than those under which the original petition was sustained.

DCFS filed a last minute information for the court on June 1, 2022, setting forth father's criminal history as follows: 2009—assault and battery (60 days' custody); 2009—disorderly person/disturbing the peace (60 days' custody); 2009—firearm discharge in a building, possession of marijuana with intent to deliver, possession of cocaine, less than 25 grams (20 months to four years' custody); 2011—unlawful use of motor vehicle, four years' probation (365 days' custody); 2012—breaking and entering without owner's permission (90 days' custody); 2013—domestic violence (12 months' probation, 93 days' custody); 2015—attempted controlled substance delivery/manufacture (12 months' custody); 2016—felonious assault (three years' custody, three years' postrelease supervision); 2016—domestic violence involving a woman with whom father had a one year-old child, second offense (12 months' custody); 2016—possession of cocaine, heroin or narcotic under 25 grams (five years' probation, time served); 2020—failure to obey court officer and unlawful transportation of a firearm, which resulted in federal supervision. The filing also reflected arrests in 2020 for assault and domestic violence; strong-arm robbery; carrying a concealed weapon and violation of a preliminary injunctive order. Father's federal supervision included drug treatment and testing, a mental health evaluation and mental health treatment. Father provided no evidence to DCFS that he was in compliance with these requirements.

**Father's request for dismissal and demurrer**

On June 1, 2022, father requested the section 342 petition be dismissed, arguing the section 342 petition presented no new information, as DCFS knew father had a significant criminal record. The juvenile court denied father's request, finding the

petition presented information not contained in previous reports from DCFS. The court compared the new allegations with previous statements regarding father's criminal history and concluded "on its face there appears to be new facts that were not known to [DCFS]."

Father filed a demurrer the same date. The court set a hearing for June 15, 2022.

On June 15, father's counsel argued that the section 342 petition was inappropriate under California Rules of Court, rule 5.560(b), which requires new information, and father's criminal history was not new as it had been discussed and documented throughout the proceedings. DCFS argued that the specifics alleged in the section 342 petition were initially inaccessible to them because they were from out of state and investigation was required. Further father had minimized his criminal history. The juvenile court agreed and overruled the demurrer.

On August 26, 2022, DCFS filed a last minute information for the court indicating father had failed to provide DCFS with proof of his participation in any services.

**Adjudication**

On August 26, 2022, the adjudication of the section 342 petition was held. Following argument, the juvenile court sustained the petition. The court ordered the parents to comply with the case plans previously ordered with respect to the section 300 petition.

The court proceeded to disposition, where the children were ordered removed from the parents and suitably placed with MGM, with reunification services for both parents, monitored in-person visits, and unmonitored telephone calls and virtual visits for father.

**Facts pertaining to ICWA**

DCFS filed a form ICWA–010(A) with the initial petition on March 23, 2022. The form indicated DCFS had inquired of the parents about the children's Indian status and that the parents gave no reason to believe that the children were Indian children. The detention report also indicated that on March 1, 2022, mother denied having any Native American ancestry, and on March 2, 2022, father too denied having any Native American ancestry. The detention report noted that in a 2017 Michigan child welfare investigation mother and father both denied the children were eligible for membership in any American Indian tribe.

On March 28, 2022, both parents filled out ICWA–020 forms marking the selection "[n]one of the above" as to any applicable Indian ancestry.

At the detention hearing on March 29, 2022, the juvenile court instructed: "To the mother and father, although you have indicated that you have no knowledge of any Indian ancestry, please, inquire of all your relatives. And if you learn that there's a possibility of Indian ancestry, if you can provide that information to the social worker and to your lawyer so that the Department can make contact and do further investigation with respect to possible Indian ancestry. Do you understand . . . ?" Both parents responded affirmatively.

The minute orders from the March 29, 2022 detention hearing stated, "The Court does not have a reason to know that this is an Indian child, as defined under ICWA, and does not order notice to any tribe or the BIA. Parents are to keep the Department, their Attorney and the Court aware of any new information relating to possible ICWA status. ICWA–020, the

11

Parental Notification of Indian Status is signed and filed. . . . [¶] Parents to make DCFS aware of any information re possible ICWA ancestry. DCFS is to follow up in [*sic*] parent's [*sic*] information."

In an interview on April 6, 2022, father again told DCFS he did not have Native American ancestry.

DCFS filed a request for judicial notice in this appeal, which includes a status review report in the case dated February 24, 2023.[4] In it DCFS indicates on September 26, 2022, a DCFS social worker spoke to MA, who denied knowledge of any Native American ancestry. On October 11, 2022, the social worker spoke with MGM, who also denied any knowledge of Native American ancestry.

**Notice of appeal**

Father filed a timely notice of appeal on September 21, 2022.

### DISCUSSION

**I.    Section 342 petition**

Father argues the section 342 petition should have been dismissed because evidence of father's criminal history did not support a finding of current risk of substantial harm to the children.[5] As set forth below, we find father's extensive criminal

---

[4]    The request for judicial notice also contains information regarding J.K.'s arrest for possession of a loaded gun, J.K.'s probation report, and documentation of a protective custody warrant for J.K., who was missing from his caregiver. The request for judicial notice is granted.

[5]    We may consider the merits of father's appeal although jurisdiction over the children is based solely on the court's

12

history, which includes acts of violence against mother, provided sufficient evidence to sustain the section 342 petition.

### A. *Applicable law and standard of review*

Section 342, subdivision (a), provides that a petitioner shall file a subsequent petition when a child has been found to be described by section 300, and the petitioner alleges new facts or circumstances other than those under which the original petition was sustained. The trial court must "determine whether newly alleged facts or circumstances establish jurisdiction independent of facts alleged in the section 300 petition." (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.) "All procedures and hearings required for an original petition are applicable to a subsequent petition . . . ." (§ 342, subd. (b).)

Because the section 342 petition contained allegations that J.K. and C.K. were children described by section 300, subdivision (b), we look to the applicable standards for assumption of juvenile court jurisdiction under that section. Section 300, subdivision (b)(1) provides that a juvenile court may assume jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of any of the following: the failure or inability of the child's parent to adequately supervise or protect the child; the willful or negligent failure of the child's parent to adequately protect the child from the conduct of the custodian with whom the child has been left; the willful or negligent failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment; or the

findings regarding mother's conduct where, as here, the outcome of the appeal could mean the difference between father being an ""offending" parent versus a "non-offending" parent." (*In re Quentin H.* (2014) 230 Cal.App.4th 608, 613.)

13

inability of the parent to provide regular care for the child due to the parent's mental illness, developmental disability, or substance abuse.

"'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.'" (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 805.) Despite section 300's requirement that the child be subject to a risk of harm at the time of the proceeding, "the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.) "The court may consider past events in deciding whether a child presently needs the court's protection." (*Ibid.*) A parent's past conduct may be probative in this analysis. (*Ibid.*)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We must ""review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that

14

a reasonable trier of fact could find [that the order is appropriate].""" (*Ibid.*)

**B.** ***The evidence supports the juvenile court's determination that father's conduct put the children at risk of serious physical harm***

Father's criminal conduct included physical violence, including two episodes of domestic violence. Father was arrested as recently as 2020 for domestic violence and assault. Father was last released from custody in 2021 and did not provide DCFS with confirmation of his compliance with the conditions for his release, which included drug treatment and mental health treatment.

The juvenile court reasonably inferred from these facts that the children would be at risk of harm if placed with father. There was evidence in the record father had engaged in domestic violence in the presence of J.K. Such violent behavior in the home places children at risk. "The mere '[e]xposure to domestic violence may serve as the basis of a jurisdictional finding'" under section 300, subdivision (b), even where the child who witnessed such behavior was not injured. (*In re L.O.* (2021) 67 Cal.App.5th 227, 239.) Mother's testimony that father had pushed her, urinated on her, and demeaned her in front of J.K. was sufficient to warrant jurisdiction where there was no evidence in the record that father had completed any programs or understood the negative impact of this behavior. On the contrary, the record suggests father's violent acts had continued both in and out of the home. Under the circumstances, the juvenile court reasonably concluded father's behavior placed the children at risk of harm.

Father acknowledges that evidence of past conduct may be probative of current conditions. (*In re Matthew S.* (1996) 41

15

Cal.App.4th 1311, 1318.) However, father argues DCFS must show a nexus between the past conduct and the current risk of harm. (*In re Roger S.* (2018) 31 Cal.App.5th 572, 583.) Father argues that his incarceration and criminal record do not support a finding of a substantial, current risk of harm to the children. Father cites *In re J.N.* (2021) 62 Cal.App.5th 767 (*J.N.*) as support for his argument. In *J.N.*, "the sole evidentiary basis for the jurisdictional finding as to Father" was "his incarceration and criminal record." (*Id.* at p. 775.) The *J.N.* court acknowledged "it is possible that evidence of a parent's violent criminal record could support a reasonable inference of risk to the parent's child," but found the evidence in the record before it did not. (*Ibid.*) The *J.N.* court explained: "Nothing in the record suggests any of Father's crimes were against children or involved children. The record also does not support that Father's criminal conduct ever placed J.N. in danger during the approximately two years he appears to have been involved in J.N.'s life. And although DCFS may be correct that Father exposing J.N. to his criminal ways could put J.N. at risk, the record does not provide any nonspeculative basis for the court to conclude that Father is likely to do so." (*Ibid.*) Significantly, in *J.N.*, the father "was not convicted of any crime involving domestic violence," and although there had been a single allegation of domestic violence in the past, it was determined to be inconclusive. (*Id.* at p. 776.)[6]

---

[6] The *J.N.* court also noted that its "conclusion that Father's criminal history did not put J.N. at risk . . . is further bolstered by the fact that Father was not even eligible for parole until more than two years after" the time of the jurisdictional hearing. (*J.N., supra*, 62 Cal.App.5th at p. 776.)

16

Here, in contrast, father had more than one conviction for domestic violence as well as a recent arrest for the crime. Mother's testimony that father subjected her to domestic violence in front of J.K. suggests that the children would be at risk from father's behavior. These facts support the juvenile court's determination that release to father's custody presented a current risk of harm to the children.

## II.    ICWA

Father argues remand is required because certain maternal and paternal relatives, including MGM, MA, and the paternal grandmother, were not asked about the children's possible Indian heritage. This appeal is from the jurisdictional and dispositional phase; therefore the matter is ongoing. Because DCFS and the juvenile court have an ongoing duty to comply with ICWA and related California law throughout the pendency of these proceedings, remand is unnecessary.

### A.    *Applicable law*

ICWA and related California statutes reflect the Legislature's intent "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." (25 U.S.C. § 1902; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) An "Indian child" is defined as any unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a) & (b).)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain

inquiries to be made in each case.  These requirements are sometimes collectively referred to as the duty of initial inquiry." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741 (*Benjamin M.*).)  "The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child."  (§ 224.2, subd. (a).)  The court and child welfare department "have an affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child.  (§ 224.2, subd. (a).)

Under California law, the child welfare department's initial duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)  Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."  (25 U.S.C. § 1903(2).)

The juvenile court must also inquire at each participant's first appearance in court whether the participant knows or has reason to know that the child is an Indian child.  (§ 224.2, subd. (c).)  In addition, the juvenile court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.  (*Ibid.*)

If the "initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' ([§ 224.2], subd. (e), italics added.) [I]f that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

We review a juvenile court's ICWA findings under the substantial evidence test, "'which requires us to determine if reasonable, credible evidence of solid value supports' the court's ICWA finding." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 21, 2022, S275578.) Even if substantial evidence does not support the juvenile court's ICWA findings, we may not reverse unless we find that error was prejudicial. (Cal. Const., art. VI, § 13; *Benjamin M., supra*, 70 Cal.App.5th at p. 742.)

**B.** *No error occurred*

The ICWA investigation is ongoing in the present matter. As evidenced by DCFS's request for judicial notice, two of the three individuals father mentioned in his briefing have since been asked about Indian ancestry.

Although the juvenile court made an initial finding that ICWA does not apply in this case, it retains the power and duty

to subsequently change that finding if new information gives the court reason to believe that the subject children are Indian children.  (*In re S.H.* (2022) 82 Cal.App.5th 166, 176.)  Thus, "an ICWA appeal at the jurisdiction and disposition stage" is premature "where there will necessarily be further dependency proceedings in the juvenile court (at which continuing ICWA duties apply) and a basis for later appeal if for some reason the remedial ICWA investigation [DCFS] is now undertaking falls short."  (*In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638.)

Based on the evidence provided thus far in the proceedings, the juvenile court did not err in making its preliminary determination that ICWA was inapplicable.  Because the record before us makes clear the ICWA investigation was ongoing below, should it become known, or should there be reason to know, that the children are Indian children, the notice requirement will be activated, and the relevant tribes will need to be notified.  The jurisdictional and dispositional findings regarding father need not be reversed in order to direct the juvenile court and DCFS "to do something they recognize they must do anyway."  (*In re S.H., supra*, 82 Cal.App.5th at p. 177.)

## DISPOSITION

The orders are affirmed.

CHAVEZ, J.

We concur:

LUI, P. J.                                        HOFFSTADT, J.

20